Please the court. This case is from the Northern District of Texas, Dallas. It involves a prosecution for basically false statements on labor condition applications and visa applications for H-1B visas. In our view, we brief four constitutional issues. One is the Bruton issue, which I'll address first. The second is a due process issue as to whether there's sufficiency of evidence on Counts 3 and 5. There's a jury unanimity issue because of a number of false statements that were introduced and a constructive amendment issue. Then there are three sentencing issues, but in the time allotted, I don't think we can get to those. The first issue is the Bruton issue. Exhibit 1 for the government was a letter that co-defendant J. Nanda wrote to the Department of Labor, I believe, and if I may, let me read it to you. It was introduced as Exhibit 1 by the government. Dear sir, your department has been an investigation that's a misspelling, D-Bond Solutions, Inc. since 2006. D-Bond has submitted incomplete and false documentation during the audit. D-Bond continues to violate all the wage and hour conditions of the H-1B visa program, including benching, no pay, LCAs, taking money for visa, and running payroll for H-1B immigrants. They have not paid back wages to the time of million to non-immigrant H-1B workers. Okay, slow down a minute. I know you want to make sure you get it all in the time, but you're speaking so fast and kind of down, it's hard to clearly hear exactly what you're saying. Do you want me to reread it? No, no. So the court did admit the statement and over-objection by Toole, which is the co-defendant. The court gave three instructions, two instructions at the time Exhibit 1 was admitted, and the right to confront the witnesses was violated by admission of this statement. Mr. J. Nanda did not testify, and so Mr. Atul's Nanda's lawyers did not have any opportunity to cross-examine Mr. J. Nanda about the statement. We believe and submit that the limiting instructions given by the court were not sufficient. In the words of Justice Brennan in the Bruton case, quoting Judge Hand of the Second Circuit, the limiting instruction in such circumstances is a recommendation to the jury of a mental gymnastic, which is beyond not only their own powers but anybody else's. So the government, once that Exhibit 1 was admitted, they put on a witness or made an opening statement outlining the fact that there was this connection between J. Nanda and Atul Nanda and that they ran the company, they owned the company, and there was any doubt about how, in our view anyway, that that statement referred to our client. The government's position is that there are other people besides the brothers who were part of the operation of the company. My first question is, did any of the other employees or personnel in the company testify at trial? There were others invited. I think three. They were two of whom became government witnesses at the trial. But the evidence of the, through those witnesses, the government's proof was they were directed by J. and by Atul Nanda. I might refer you to pages 34 and 35 of the reply brief of the, I'm sorry, the government's brief where they outlined the evidence that was connecting J. Nanda and Atul Nanda to the offenses. I'm not going to read you all that are on those pages, but there was extensive evidence that these folks, that is these two defendants, ran the company, they owned the company, they directed the false statements, they directed activities such as fencing, they directed activities such as making the consultants pay for processing fees and so forth. Well, let me ask you a question. But for the fact that this is a corporate environment, how does this differ from other brutal cases that involve, say, you know, violent conspiracies where you take the non-testifying co-defendant's affidavit, you redact the names, you know, stole the victim's wallet, then the victim was murdered. And the co-defendant is on trial and they know it was the co-defendant's car and so on, so everything is there except the name of the co-defendant, and typically we hold that that's admissible. But there are cases, to that effect, there are also cases saying that that's not sufficient, where it's clear that the reference is to a particular individual whose name was redacted. We cite two cases that support our position, the Swartz case out of the Eleventh Circuit and the Garud case out of this circuit, where this court reversed because of the omission of that kind of statement. And so in a case of this nature, where there is the issue of who said what to whom over a lengthy period of time, it was important that this statement not be admitted against Atul. He had no opportunity whatsoever to contest the statement. He had no opportunity to cross-examine his brother about what he meant, no opportunity to show that there were particular circumstances, a dispute between the brothers that caused this to happen. Now you're representing both of them on appeal, right? I represent both on appeal, that's correct. The statement in the brief, well, we make a note in the brief that this particular argument only applies to Atul and doesn't apply, of course, to Jay because there's no constitutional violation there. So we suggest very strongly that that issue should be resolved in our favor and Atul should be granted a due trial on that basis. The next argument has to do with counts three and five. Counts three and five are wire fraud counts. The indictment alleged, as part of the allegations on wire fraud, that there was a scheme to defraud and to obtain money. So there were two separate allegations in the superseding indictment, one to defraud and one to obtain money. In the Cleveland case, the United States Supreme Court reversed a mail fraud prosecution on the basis that if you were only, if you were not just saying that necessarily only, but if you were seeking as part of a scheme to defraud to obtain a license, then that was not a scheme to obtain property as required under the mail fraud statute and the wire fraud statute is interpreted the same, or the same law applies to the wire fraud statute. So in this case, what we have is applications, labor condition applications and visa applications that are for essentially a license of some kind, a license to come into the United States and to participate in the workforce here. So this case, in our view, is on all, if not on all fours factually. It's very similar to the Cleveland case and requires reversal of those two convictions. The government raises the argument that, well, there, this was in part at least, a scheme to defraud workers of money because when you bench them and you don't pay them then they're deprived of the money that they were supposed to receive when they came into the United States. That, in our view, if it was part of their argument at one point, but it's unclear just to what extent it was, how excessive that argument was, but nonetheless their main argument was this was a false statement to obtain a visa, ultimately a visa, H-1 visa for these workers to come into the United States. So under Counts 3 and 5, we don't think that there's sufficient evidence. And if the court felt that there was justification for both of those theories, one is to obtain money and the other one is to obtain, under a scheme to defraud, the visas for these workers by using false statements, then that's also reversible error. We cite two cases where that issue has come up recently in other courts of appeals and the courts of appeals have reversed. They've reversed on the basis that one of the theories was invalid because there was a seeking of a license or, in our case, a visa application. So we think Counts 2 and 3 should be reversed. I think another constitutional issue that we would ask the court to consider, well, I know the court would consider, is the issue of jury unanimity. Now, this is an issue under plain error that was not raised in the trial court, but the government's evidence was specific in Count 1, the conspiracy count, to alleged violations of the, essentially, of the act governing false statements for visa applications. They also had allegations in there about false statements, generally in terms of mail fraud and wire fraud, but nonetheless the essential basis for the conspiracy count were false statements. There were specific allegations as to which false statements they were referring to and there were specific allegations under the overt act part of the indictment on the conspiracy. The court ultimately only instructed us to Count 1 on the visa, the violation of the visa fraud statute, but nonetheless all of those allegations were incorporated in addition to that into Count 2, the harboring conspiracy, and Counts 3 and 5, the wire fraud counts. Was a special unanimity instruction requested on behalf of your clients? I know you weren't trial counsel. They did not do that. There was no motion to eliminate before trial or anything? No, there wasn't. There was a specific, I'm sure the court is well aware, I think it's 1.25 of the model instructions for the Fifth Circuit criminal that contains an instruction, but it was not offered. But nonetheless, there were very, very substantial other false statements that were introduced in evidence. I know jury unanimity instruction was given. I thought they quote language from the district court that did say you must all agree. There is language in the, that's true, Your Honor. It is true, but it's the instructions for, I believe, each of the counts also say, as they refer back to the superseding indictment, okay, but nonetheless there is no limiting instruction or jury unanimity instruction about which of the false statements the jury must find in order to find the defendant guilty or the defendant's guilty. And there was evidence from the government's summary witness of 200 and some odd different false applications. Does that mean you should have had a verdict with subsections for each false 200 subsections? Is that what you're implying? One way to handle that was a special verdict. One way to do that was to specifically instruct the jury that they were only to consider the matters that were alleged in the indictment. And the other way to do it would be a general instruction to say, as set out in 1.25 of the model Fifth Circuit instructions, is that there are a number of false statements, but you all must unanimously agree as to which false statement that you found was false. Given the gravity in which you argue, why wasn't it objected to or affirmatively asked for? I mean, we know the trial judge is charged with doing it, but it seems like it would have been a pretty big issue to be raised by trial counsel in an objection. And the whole point of objecting is so that the trial judge can cure, if it is an error, or otherwise deal with it. There's nothing in the record that indicates why they did not ask for that. I would just say that we've cited, I believe it's a Sixth Circuit case that says that that can be, we believe that it can be considered under plain error. I don't know why they didn't. I don't know why the government didn't ask for it. I'm not sure they should have. It can be considered as plain error, but the point is, it's one of those kinds of things that the whole point of contemporaneous objection is aimed at. You point out to the trial judge the issue, there's an availability to cure it, other side can respond, et cetera, rather than it's kind of there. You said there are 200 and some statements on appeal. It's sort of a neon sign issue to then get through the prongs of, you know, on plain error. I mean, that's why I asked whether it was a strategic reason not to object or something else. There's none that appears in the record that there was a strategic issue, and we think it's a substantial issue. We think it should have been instructed on. That's about all I can say to that. There's nothing in the record that indicates it wasn't a strategic decision on their part. All right. Thank you, sir. Thank you for your rebuttal time. Ms. Simonton. May it please the Court, Leah Simonton for the government. Beginning with the Bruton issue, I want to emphasize that the standard of view is abuse of discretion, and it's very important to put the decision that Judge Lynn made here in context, because in context and given the case law, there is no way this Court can find that was an abuse of discretion. The discussion about this exhibit began in the pretrial conference, and it was an ongoing conversation that went on between the Court and the parties through the second government witness. The Court did not make this decision quickly, and she consulted numerous amounts of case law cited by both parties before she did. In the beginning, she was dubious about this exhibit because she understood that Jay and Atul Nanda were two of the principals in this company. But as she reviewed the case law, and just as important, as she found out what the defense's theory of their case was, she found that in context this letter did not directly implicate Atul Nanda. And that was because in the pretrial conference she became aware that one of the defense, well, the defense theory was that Atul and Jay Nanda were going to point the finger at other people working within Daibon as the perpetrators of this illegal scheme. And at one point she asked the government counsel to leave the courtroom and had a sealed ex parte hearing where she heard the extent of the defense's theory on that. And I welcome the Court to look at that transcript. And it was after that that she began understanding that this was not directly implicating Atul Nanda. She held the issue in reserve, reviewed more case law, saw how the defense developed their theory in the openings, and in my brief I quote extensively from Jay and Atul Nanda's opening statements where they developed this theory, and they point fingers at numerous other people in Daibon, many of whom testified at the trial. They used words like, these people had their own agendas, and Atul and Jay Nanda delegated responsibilities for immigration-related things to these people. She saw that theory develop, and then after that she explained in deciding to admit this exhibit that based on the case law and that there was no direct implication of Atul Nanda in this letter, and that there were many other people within Daibon who could have committed this fraud and not have involved Atul at all, that this letter was admissible. Now obviously she coupled this with a very strong limiting instruction. And as I emphasized in my brief, she gave that limiting instruction three times, twice before the letter was admitted. She re-read it because it was a long instruction, emphasizing that the jury could in no way infer that when the letter referenced wrongdoing by Daibon, it was talking about Atul Nanda. And she re-read it, and then she again included it in the final jury instructions. And the court in her discretion found that this preventative measure would keep the jury from drawing a prejudicial inference from this letter. And I also want to emphasize how careful government counsel was with this letter. Government counsel only referred to this letter once, and it was one time in closing statement. And he prefaced his reference to this letter by saying, now I want to talk about a piece of evidence that goes only to Jay Nanda, only to Jay Nanda. And then he explained how that letter showed that Jay Nanda knew what was going on at Daibon. And that's why that letter was so relevant and why Judge Lynn understood that it was important for the government to have that letter in, because Jay Nanda's defense specifically to him was that he was out of the country a lot of the time. He was in the London office. He was also doing other things. He was helping to buy an animation company. He was delegating responsibility for the company to others. And so the government needed this letter in to show that Jay knew what was going on because Jay was the author. But the letter didn't show anything about what Atul would have known was going on at Daibon, and that's why it was admissible. But the government counsel was careful. Also, during the presentation of evidence, the only time government counsel referred to this letter was in the witness who presented it. And the witness who presented it was on and off the stand. It was about five transcript pages of testimony, and all the witness did, it was an agent from the Department of Labor, was read the letter. And so there was no casting of the letter as anything in reference to Atul in this whole trial. Now, the case law that I've cited several cases in my brief that deal with corporate atmosphere where you have a statement by someone involved in a company or related to a company about the company's wrongdoing. And the courts, including this court in the Jimenez case, have held that those statements were admissible under Bruton. And that's, like I just said, the Jimenez case, which is very similar to this case. And then also we have the Lung Fong Chin case from the Second Circuit and the Williamson case from the Eleventh Circuit. The Swartz case that Jay Nanda relies on is very distinguishable from this case. It's really an outlier case. And the reason is twofold. One, in that case, the statement at issue referred to several entities that one man, Mr. Swartz, controlled. So you had a reference in this. Well, the whole affidavit was really about self-dealing among several companies controlled by one man. So the clear implication there was there was one man who was doing this. But even though there was a reference to these different companies, it was really an alter ego for this. They were alter egos for this one man. Secondly, what the court, and it was Eleventh Circuit in that case, what the Eleventh Circuit emphasized was it wasn't just that there was really only one person that could be implicated by reference to the companies in this affidavit that made it problematic. But more than that, in the prosecutor's closing argument, the prosecutor explicitly linked that affidavit to Mr. Swartz, the defendant. So in other words, the prosecutor impermissibly used that affidavit as evidence against Mr. Swartz. He said, when the affidavit, when this government exhibit talks about this company, we know from other evidence that company is Mr. Swartz. Well, obviously that is not allowed under Bruton because he was directly making the connection there. And in this case, in no way did the prosecutor do that. He and the court were very careful about how this letter was used. And I also want to emphasize before leaving the Bruton argument that there is harmless error analysis that attaches to this. So even above the fact that really this could not be an abuse of discretion was the fact that there was overwhelming evidence against Atul Nanda. And I have listed all that evidence in several bullet points on pages 34 and 35 of my brief, but I want to highlight just a few pieces of evidence here. One is the testimony by Mr. Mansukh Bhai Vora, who was one of the Dai Bon recruits who was led to believe he would have a job when he moved here, and he ended up not. He was on the bench with Dai Bon for seven months looking for a job. He finally found a job with St. Jude's Medical Center. He met with Atul Nanda before he moved to Memphis for that job. And Atul Nanda told him, you have to sign these leave of absence forms to cover the time you were on the bench. Or we're going to cancel your visa. And Mr. Vora was like, why do I have to sign these forms? I was here the whole time ready to work. And Atul said, that is the way it is. You have to sign these leave of absence forms. So right there in the record we have direct evidence that Atul Nanda was doing these illegal things that Dai Bon was charged with, with keeping people on the bench, making them sign leave of absence forms for time where they really were not on vacation, but they were ready and willing to work, but they were not allowed to work because Dai Bon had lied to them. How did they make money off of this if you've got so many people on the bench at one time and you're paying for their housing? That is a good question, Your Honor. In many cases they were not paying for housing. They did have a guest house. It was one or two apartments that they called guest houses. Some of the people did live there, and you're right. They were paying the rent on that, and they were giving them some grocery money. But a lot of these recruits who testified, and there were at least five recruits who testified, at least half of them said they lived with relatives. So a lot of them had relatives in this area. And so the relatives would house them and drive them to work every day. So Dai Bon did have the overhead of a small office, and they did have some apartments. But other than that, they were making a cut off of everything. They had a lot of recruits who ended up working at some point, and they took a cut off of the salaries of all of those recruits who worked. So they had relatively low overhead during the time that the people were on the bench, and then they got cuts of the money whenever the people got jobs. So clearly it was a sustainable business model because they made millions and millions of dollars every year. Well, didn't they have other lines of business besides this? They did, but there was no evidence that those were profitable. But they did have many recruits, and so we have several recruits who were benched at many times, but we also had recruits who were working. They were out in the field and they were working. Also, they didn't have the overhead of the visa fees because they made all of the recruits play the visa fees. And so they had no skin in the game in bringing these people over, and they didn't have the normal expenses that a legitimate H-1B company would have, and they made lots of money off of those visa fees. So there was harmless error. There was no error, but if it was, it was harmless, and that was clear. There are also some e-mails where a tool is implicated in the e-mails where they are openly discussing these practices, and that's e-mails that are government exhibits 3, 12, 13, 110, 153, and 246. I want to move briefly to the second issue, which is that the NANDAs say that the government had a theory that in the wire fraud counts, we were really just charging visa fraud again. That's not true. As I emphasized in my brief, the counts 3 and 5 charge deprivation of money, not property. All of the cases that the NANDAs rely on, there was a charge of deprivation of property, and the issue was our licenses, our different things like that, property. We didn't charge property. We charged deprivation of money, and the prosecutor in his closing argument could not have been more explicit about what the government's theory on counts 3 and 5 was. He said they recruited for the bench, made people pay fees, didn't pay people while they were on the bench. That is the scheme alleged in the indictment, and he was referring specifically to counts 3 and 5, and then he continued. The false representations were, quote, you've got a full-time job, you're going to get paid when you get here, we've got a project for you, no problem. False. They, the NANDAs, knew it was false. The testimony demonstrated that was the practice. That's from record at pages 2357 through 2358. So it was very clear what the government's theory was, and it was a deprivation of money. Now, if this court were to somehow find that the government had a different theory, then there's the concept of alternative theory error that comes into play, and that is a harmless error type of analysis that this court would employ, and basically it holds, and this is under the Skilling case, after it came back down to the Fifth Circuit, implemented this theory that had been first expressed in Hedgpeth v. Polito, and it said that if the court instructs on a theory, or if the government presents a theory that ends up being invalid, that's not a structural error. In fact, if there was another theory that was also presented and it was valid, then as long as there is sufficient evidence to support that valid theory, there is no error. Now, what's a Supreme Court case about valid theories versus invalid theories? The old one was Yates. It was Yates, and then it was overruled to the extent that it held this was a structural error. No, it was overruled. Justice Scalia wrote an opinion, and he distinguished between theories that were invalid on the facts, insufficient on the facts, and theories that were invalid at law. Isn't that right? There was, and that was changed. No, Scalia's opinion was not changed. This is different. This is actually a different. Remind me the name of Scalia's opinion. I always forget that name. I don't recall. It's our court. It changed our law. Yes. I direct you to the Skilling case because the Skilling case. I know. I'm not sure if I think the Skilling case is right. That's why I'm trying to probe you more about it. Okay. It's our law, but I'm a little dubious. Well, Hedgpeth v. Polito is a Supreme Court case that held that alternative theory error is not a structural error, and that it was explicitly referred to in the Skilling case where it held that when an honest services fraud theory was given to the jury that ended up being invalid, obviously after the Skilling Supreme Court case that was held to be invalid, that was harmless error because it was another theory given to the jury, and sufficient evidence supported that theory. But I also want to say that this is not a regular harmless error case because the government argues that this was a plain error standard of review for this issue, so it's actually the NANDA's burden to prove an effect on their substantial rights. Still time counts three and five. Yes, Your Honor. Because this is a legal argument that they are raising. So you don't need to reach Skilling and Hedgpeth at all. You don't, exactly, because that's harmless error. Exactly. Was there a new argument? Was it raised below? My argument about plain error was, yes. I say this in the standard of review. The defendant's argument about counts three and five. Yes. Was? Whoa, no. No, in the trial court, the NANDA's did not raise this argument. So it's no. Never, yes. So we argue it was a plain error standard of review. They try to cast it as a sufficiency of the evidence argument, so they didn't have to explicitly raise it, but we have cited case law in our brief that when you have a legal argument, you can't couch it as sufficiency of the evidence. This is an argument about whether the government presented an invalid legal theory, and that would be a plain error would apply to that. Moving to the next issue about whether the court needed to give a special unanimity instruction on all of the counts, this is also plain error, and I think the court all touched on that with opposing counsel's argument, that no one ever requested a special unanimity argument or argued that that was required. And, in fact, under the law, it's not required. And so there's no error, much less a clear error. And so we take this in two parts. First, we have conspiracy counts, and the law is clear that there is no need for a special unanimity instruction when you have conspiracy counts, and that is the Mason case that the government cited in our brief. And the Mason case holds that you do not need a special unanimity instruction as to certain overt acts, that it's the conspiracy itself that requires agreement by the jurors, not specific overt acts. And, Judge Jones, as you had asked, the court did provide a general unanimity instruction, so it was completely in line with normal case law, requiring that in all cases you provide that instruction. She instructed the jury that all of you must agree and your verdict must be unanimous on each count of the superseding indictment, and that's from record at page 2405. So the Mason case distinguished the two cases, two of the cases that the Nandas rely on, which are Hawley and Gibson, because they concerned other circumstances. Hawley was a perjury case, where obviously you have to agree on a statement that constitutes perjury. That's not a conspiracy case. And then Gibson, there was a very messed-up instruction that was given in Gibson, and that was the reason why, because it seemed to suggest the jury didn't have to be unanimous as to the crime. On counts 3 and 5, you don't need a special unanimity instruction as a certain false statement for mail or wire fraud. You have to have unanimity as to the scheme, not to specific false statements. And, obviously, as a corollary to that, a unit of prosecution in a mail or wire fraud case is obviously the mailing or the wire. It's not a specific false statement, so it's unlike, for example, perjury. And the most explicit discussion of that, and it's cited in our brief, is from the Daniel case in the Seventh Circuit, where it reviews other case law and has a very long discussion on why you do not need a special unanimity instruction in a mail or wire fraud case when you're talking about when there might be many false statements that are involved. As this is plain error, the NANDAs also need to show an effect on their substantial rights, and they have not done so. They have an argument that is just not based in case law, that a promise of future behavior can't constitute fraud. That's not true under the case law. I would also submit to you, we're not talking about promises of future behavior. When the NANDAs were giving their offers to the recruits and when they were submitting this paperwork to the regulatory agencies to get the visas, they were talking, they were certifying that they were talking about jobs that were currently open. When you submit this paperwork to get an H-1B visa, you cannot submit it for a job that you think you'll have open in six months. You have to submit it for a job that's open now. And many witnesses testified to that. And so the NANDAs were lying about a job that they currently had open when they were talking to these people about them. And then the NANDAs also say that these statements, some of the statements were ambiguous, but that's just not true. And then even if it were, they didn't request any instruction on ambiguity as a defense. How many years did this go on? How many years? It was six years charged in the indictment, the conspiracy. And it was investigated a few different times. There were a couple different audits done by the Department of Labor, and then finally it was turned over to Homeland Security. Finally, on constructive amendment, I only need to talk a second about that. Yes, there were other petitions that were submitted aside from those charged in the indictment, but they were exactly like those charged in the conspiracy counts. And black letter law is that you can prove over an ax that we're not charged in the conspiracy, and that's the Elliott case that we cite in our brief. And I also want to emphasize that the other petitions were only discussed for about five transcript pages. It's 2152 to 2157. And she discusses these other petitions only to show that most of them said that the workers were going to work at the Carrollton location of Daubon when that was not true. So it was for a very specific purpose. It was very limited. And there was clearly no effect on substantial rights. This is another plain error issue. Because there was so much evidence against the Nandas that whether these few exhibits got in or not did not make or break this case. If the Court has no further questions. If you have any comment about the loss calculation issue, you want to just rest on your brief on that? I'll just rest on my brief on that, Your Honor, including that there is a harmless error argument on that because she said she would have imposed the same sentence anyway. Thank you, Your Honor. All right. Mr. Warsh, back to you. Please, Court. In response to an earlier question about redaction on a co-defendant's statement, whether that's sufficient, in Swartz's case, which was briefly discussed by the government, in that case there was a redaction. But the Court said that was not sufficient, nor was it sufficient on limiting instruction. And this Court in Negeri said the same thing in 2014, that admission of a non-testifying co-defendant is out of the Court's statement. In a joint trial, violating the defendant's right to confront the witnesses against him, although the defendant's name was redacted. So we put that out to the Court. One of the issues that has come up is what were the defenses in this case? And it is true that part of the defense was that there was inactivity by at least J. Nanda, that he was gone a substantial amount of time, that they delegated it to other people. But there were other defenses in this case that were substantial. For instance, they were not required to pay a worker that was coming from overseas until 30 days after they got here, or if they got here and there was a job, then they had to start paying them at that time. Most of the workers came from the United States, so that was a different regulation, and you only had to pay them after 60 days or whenever they started. And so that was a defense. There was another defense, for instance, that when they submitted the applications, they said we're paying them on an annual basis. They didn't say the representation wasn't as was alleged, that you had to pay them right away.  So there was an ambiguity in the statements, and there was a statement, too, that since the application was filed in April and they didn't come on until October, there could have been a change in the meantime with respect to the various workers that came into the United States as to whether or not there was a job waiting for them at the end of six months. In some instances, the contract got canceled, the job was no longer available. So there were substantial defenses in this case, and so the errors in this case, we respectfully suggest, were not harmless. One of the things that is on Counts 3 and 5 is the government says that it was clear that it was only about getting the money, but that's not what was charged in Counts 3 and 5. In Counts 3 and 5, there were two different parts to it, and I'm referring now to the Denim at page 15, which is the charge for Counts 3 and, well, it says 3 through 8, but Counts 3 and 5 was what those counts were tried. It says, for purposes of executing the foregoing scheme and artifice to defraud. And so then it goes on to say, and to obtain money. There were two different submissions there. The government also says in its brief that all we had to prove that there was a wire. Okay, that was the essential part of it, and it didn't make any difference whether it was about money or seemed to defraud, but that's not what the element said. The element said that there had to be a scheme to defraud, and that scheme to defraud referred back to Count 1. Counts 3 and 5 refer to Count 1 that has allegations of false statements to get a visa application and to get a visa, and also the labor condition application. So it's clear that that was part of the government's theory, that they submitted an expert testimony, as I said in my opening statement, 200 and some odd different applications, and it didn't have a summary witness saying, well, this is what we made. Now, the defense put on saying this is how much money we actually paid out, but there wasn't anything in terms of what the profitability was on these particular files. One of the issues that was brought up was in terms of the overreacts in the indictment. The court at the end of the evidence instructed the jury to refer back to the superseding indictment, and she said in that she'd refer back to what those overreacts are. But there was no instruction, again, plain error, about what about all the other 200 and some that were out there. And the error, in my view, was compounded to when you looked at the overreacts, the overreacts had several different submissions in each of the overreacts. Those submissions were this and this and that. So they were like, in most of the overreacts, two different allegations of conduct by the defendants that constituted a conspiracy to commit vius fraud. And, again, the jury was not instructed, again, that they had to be unanimous on that. So it was a roving commission, and so we point that out to the court. One thing on the jury unanimity issue was that if you consider that there were 200 and some odd different false statements submitted, it was impossible for the jury or anyone else to say what they got convicted of. Did they get convicted because they didn't pay them within the 30 days, which they didn't have to? Did they get convicted because they didn't pay them within the 60 days when they didn't have to? Did they get convicted because they said on an annual basis we're going to pay them, that's how we're going to pay them, which is an ambiguous statement construed against the government? Is that what they got convicted of? Nobody knows. Now, I understand nobody raised this issue, but it's still before this court. And one other thing that I wanted to point out to the court that we briefed seven points, and it may be that on an individual basis, we think individual basis, that there is reversible error, but there is such a thing as the court well knows more than I do of cumulative error. And we have submitted four different constitutional violations, which we believe the record supports and the argument supports, and three different sentencing issues. So we think under the doctrine of cumulative error that these folks did not get a fair trial. The evidence for the court below is that every other defendant in other cases got probation, including, I don't know what's in the record, but I can represent to the court that the three co-defendants, or two of the other three co-defendants, two of whom testified, I think all three got probation. Other cases around the country, everybody gets probation. These folks get 87 months. So we think under the doctrine of cumulative error, their convictions should be reversed. Thank you very much. Thank you, sir. Thank you, counsel, on both sides. The case will be submitted. All right, we'll call up the next case.